Good morning. May it please the court. My name is Tommy Morgan. I'm with the Kershaw County Attorney's Office and we represent the appellants in this matter. And your honor, this morning we are here asking the court to reverse the order of the United States Magistrate awarding the appellee the attorney's fees and costs pursuant to Rule 37C of the Federal Rules of Civil Procedure. Related to her motion for default judgment and other relief, that was ultimately denied inasmuch as the appellants contend that the award of the fees is plainly wrong. Now I'm sure as the court is well aware, Rule 37 permits a court to require a party who provides evasive or incomplete disclosure to pay costs and attorney's fees of the requesting party. A court should not order sanctions under the circumstances make an award of expenses unjust. That's pursuant to Rule 37D-3. And this is in keeping with the purpose of Rule 37, which is to allow district courts to punish deliberate non-compliance with the Federal Rules of Discovery and to deter such conduct in the future. And that is a case that has been decided by this court, Zorns versus Specialty Industries Incorporated. And in this particular case, the appellants think that the order was plainly wrong on several grounds and for several reasons. And first and foremost, as the court is well aware, the nature of the genesis of this dispute is the appellee's motion for default judgment based on whether or not there was dash cameras or dash cam video that was involved in the incident, which ended in the tragic shooting of the appellee's decedent. And that question turns on, as has been pointed out, I think, in the briefs, on what dash camera and what dash camera video is. And I think that, as has been pointed out in the briefs, has been causing some confusion throughout this process, and hence the reason why when certain people are asked whether there's a dash camera or so on and so forth, I think it's a good record that the definition in and of itself has a little bit of, I don't want to say leeway, but there is some room for interpretation inasmuch as the facts clearly show in this instance that there was just the head unit in the vehicle as opposed to a full-blown camera system. Because the definition of a camera ultimately requires for a device to be able to record images, not just view the images as existed in this particular case. Now, it's also very important to point out that the court, in denying the appellee's motion for default judgment, concluded that there was no video evidence to be destroyed. In order for there to be no evidence to be destroyed, no video evidence, there had to not have been a dash camera in order to record that evidence. So by its own terms, the appellants believe that the order affirms their position that there has been no dash camera, hence no evidence that could have been destroyed. Well, the magistrate judge and the district judge essentially thought you were hiding the ball. Didn't they? I think... Tell us why you weren't. Well, I think, Your Honor, I think it's very clear. The reason why we were not hiding the ball is they're not a ball to hide. If the court takes note of the record before it on the joint appendix, for example, on pages 151, includes the sled investigation. That's what investigation that was conducted the very night and into the next day or so after the 28th, 2012. And there's no mention whatsoever in the voluminous individuals that were interviewed, evidence that was reviewed and collected, there's no mention whatsoever of any video. And it's for that reason, it supports the position that there's just nothing to hide. And I know it's almost illogical, you know, kind of tautology, we keep going around there, but there was no video to be destroyed because there was no camera to record the video. And that's the reason why if you ask, and the affidavits that were provided in support indicate the police officers, when they consider a camera, they consider the entire system, not just a certain component of it. Also includes recording device for the audio, oftentimes kept on the lapel of the officers. So I think that's the reason why there's a little bit of confusion from that standpoint. But it's not just that reason alone that the appellants contend that the order was plainly wrong. It's also because the fact that the appellee in this instance didn't utilize the discovery rules available to her in order to seek out any type of redress as it relates to, well, I've got this photograph, it seems to show a head unit there. Why, what is going on? Well, I, you know, I thought that they asked for the make and model of the camera. Did they not? They did do that, Your Honor. And they asked for an explanation. If there was no video, please explain. They did. That is correct, Your Honor. So why, why, why wasn't the magistrate judge entitled to find that you weren't forthcoming? Well, Your Honor, in that instance, first and foremost, I'll point out that those discovery requests and the answers and responses were provided in December of 2014. And again, that leads credence to the appellant's position that that would have been the whole reason to utilize the discovery process and ask and seek further information about that. And so I think that process. I didn't follow that argument. I thought the gist of your argument was that they didn't ask for this or they didn't ask for it the correct way or they didn't ask for it with enough detail. And is that your, is that the gist of your argument? I think that is part and because it's not only just the fact that they didn't ask for it necessarily the correct way, but then what the response was that there was no camera, ergo, there was no video. That's because of the fact that the appellants in this instance didn't consider just the head unit to be the camera. I understand your position. I'm surprised that you would offer that argument. Your Honor, and I know it's, I just want to give the court a truthful assessment because that's the reason why this has been kind of where we find ourselves today is because as the affidavit of the sheriff shows. Well, the next time you get a request for a camera or a video or whatever this is and you have half of it or some part of it in the car, I trust that your client is going to respond. We have half or a part of it or something, but we don't have the whole thing and we don't consider that. Or at least he's going to respond, we don't consider that your request is for something that we have. That's what we, that's our consideration. I understand your Honor. Because we're supposed to look at this objective, not from what your subjective view of these things is. Correct, your Honor, and that makes perfect sense and I do think that this, I think quite frankly has been an instructional moment for the parties involved as it relates to the court's disposition, what it said as it relates to the response, whether there's a partial unit, just the head unit, so on and so forth. So what if there was a fully, a complete unit, head, body, the whole thing, but it wasn't working? Your client, I guess, would have said there was no camera. Because it wasn't, in its view, there's no camera because there's no working camera. I mean, you can see how that would be, that's not really what we're supposed to be doing in litigation and in discovery responses, are we? Correct, if that were the case, your Honor, I could see that argument very clearly. Does the record show what happened to the vehicles that disappeared? Your Honor, the only indication that I have is, I recall in the record, indicates that one of the record, one of the vehicles was wrecked and destroyed pursuant to, I think, a tree falling on it. I think it was ultimately what ended up happening onto the other vehicle. Your Honor, if I may just, and finally, I would like to point out, as part of the order itself, and one of the main issues that the appellants contend is clearly wrong, is the language that's contained on page two of the order, Majority Appendix 1014, that page. And it says that, amidst a national atmosphere of civil unrest and apprehension toward law enforcement, stemming from numerous videos from incidents across the country, capturing violent encounters between police and African-American citizens, then the court goes on to say that the repeated lack of a forthright, precise response from the defendants regarding the presence of a camera is indeed disturbing. And, Your Honor, the appellants would like to point out that we think that this is a clear error because it's taking into facts and consideration items and occurrences and situations and disturbances that are outside the facts as it relates to the shooting death of the appellee's decedent on February 28th, 2012. Now, Your Honor, I know it's unbrief, and I would like just to point out, there were two cases that the award of fees was an error. The Zorns case, Your Honor, which talked about the repeated failings of particular parties in that instance after being specifically warned, saying that there was not evidence that existed, and then finally, just before the deadline, providing that evidence. In that instance, we think it's differentiated between the facts and circumstances here, inasmuch as the district courts concluded that there was never any video to be destroyed. And then, there was another case that the district courts found that there was no sanctions that should have been awarded inasmuch as there was attempts and then not other attempts by counsel or contact to discuss the scope of the easements that's issued in that case. And for that reason, the appellants believe that Milton is instructive that, in this instance, the award of fees should not be discussed. And it discusses, even, the American rule about the parties bearing the cost of their litigation. In this instance, finding that there's no evidence to be destroyed, but then granting the cost of the fees for bringing that motion. The master judge suggested that the arguments that you've made today have been waived because you never raised them until the motion for reconsideration. And that argument is reiterated by your colleagues on the other side. What do you have to say about that? Your Honor, I think that the fact... Did you make them originally? Tell me that first. I do not think that were made expressly in that particular fashion, Your Honor. So, and you're very big in your argument about doing things in a particular fashion. And you're talking about the other side, right? I'm sorry, Your Honor. I failed to... Remember earlier in your argument, you said that they should have done... Correct. Yes. So, they should have marched right along with what you think is the appropriate procedure. But the appropriate procedure would put your argument that you think is a winner in the original motion, right? In the original response. Yes, Your Honor. I do believe... And you didn't do that? Not to the extent that it's been described today. So, why was the court wrong in saying you waived the argument? Well, I don't think the court necessarily said that we waived all of that argument in response. Okay. Why would the court be wrong? Why would we be wrong to say that you waived the argument? Well, Your Honor, I would like to, if I could, point the court's attention. It does point out on the joint appendix, page 1076, that would be the order, I believe the motions are to deny the motion to reconsider, that the defendant's argument that the plaintiff did not correctly utilize the discovery rules was available but not raised. And as much as the court has just pointed out, it was not brought before the lower court. I think, Your Honor, that that is correct in the standpoint that it was not specifically brought out. But I'm asking you what... So, why wasn't... Why haven't you waived the argument then? Your Honor, I think that the arguments that have been contained in the briefs have been before the court to a certain extent, and I think there may be some portions that the court... You don't have any legal authority. You just... We should be good guys and look at them, is that it? I have no legal authority to... Okay. ...to support that at this point in time. Okay. But I'd be happy to provide any supplemental memorandums should the court so wish. Now, this is the time to... Yes, certainly, Your Honor. ...have a lot of briefing. Certainly, Your Honor. I understand. I have nothing further for the court. Are there any questions that I may be able to answer at this time? No, thank you. Thank you, Your Honor. Scanlon. Good morning, Your Honors. May it please the court. This case comes down to two key questions. First, whether Officer Elliott was trapped and dragged in the vehicle in which Ms. Wahlholm was riding. And question two is whether the false statements about key pieces of evidence in this case. On question one, the truck driver testified that Elliott was not dragged. Our expert testified that he could not have been dragged. And the sled investigator testified that there was no evidence that he was dragged. On question two, the record clearly indicates... Excuse me. Discovery responses in multiple instances that denied the existence of a camera and deposition testimony in multiple instances denying the existence of the camera, including by the officer in whose car the camera was located. And yet we now have definitive evidence of pictures demonstrating that camera. And for those reasons, Your Honor, we ask the court to reverse the summary judgment ruling of the district court. I'd like to start, if we could, with the qualified immunity question, the second issue raised in our Stross appeal. That issue really comes down to the fact that there are material disputes of fact in this case. And as this court has noted, whether it's a qualified immunity question or a substantive constitutional question, material disputes of fact preclude summary judgment. What are the material disputes of fact? Specifically, Your Honor, it relates to whether Elliott was actually trapped and dragged by the truck. That is the material dispute of fact. And there's... Well, I think that whether the other side thinks so or not, the law is pretty clear that you get, when there is a dispute of fact, the best light for you was not dragged. Correct, Your Honor. Voluntarily putting his head, body, whatever, in the car. Correct. Although, whether he was actually in or outside of the car at the time, the key moment, we think is disputed. Okay, show me where that's disputed. Those facts, whether he was actually leaning in the vehicle at the time he shot. Correct. Yes, Your Honor. For one, our expert testimony, Elliott's testimony was that he was trapped in the vehicle, his vest or his arm was at one point, and then as the car moved forward, he was trapped and that's why he shot, that's why his body was inside. The testimony of our expert was that that's not physically possible. If he had been trapped when the vehicle began moving forward, he would have become untrapped. So you're saying that by inference, if he couldn't, your expert was saying he could not have been leaning in unless he was running faster. Correct, Your Honor. Yes. And how do you pronounce the expert's name? We just call him Dr. Z. Dr. Z is the biochemical expert. I wish I could pronounce his last name. Okay, so you're saying that the inference from Dr. Z's testimony that the events could not have taken place at the moment of shooting unless he was outside the car running faster than the car. Yes, ma'am. That's basically his testimony based on his analysis of the testimony that Elliott and the other witnesses gave and his biomechanical engineering looking at the vehicle, the Ford Ranger, and how far the window was up based on all the evidence of where everything was and that sort of thing. Does the record show how tall the Ford Ranger was? I believe it's probably in his report and I could get a record citation for Your Honor at least on reply. What about the testimony of the driver, the other person that was there? Mr. Herbert. Mr. Herbert. Mr. Herbert testified that he was a hundred percent sure that Elliott was never trapped or dragged from that vehicle. I'm not talking about the trapped or dragged. I'm talking about the, you've got, that's for purposes of this, of our conversation with each other, I assume he was not trapped, okay? Okay. That, and that is, are you 100% sure of that? Yes, I'm 100% sure of that. But, he does testify that he was inside the car when he was shot. He does testify that there was a little physical back and forth. No, no. It's better than that for the other side. Yes, ma'am, and I wouldn't, I wouldn't contest that. Well, he's either inside the car or he's not. Well, and I think that's the question. No, but this witness says he's in, who was there. There's three people there. One man's dead. One man's the, one man's the person that did the shooting. Right. And then there's this driver. Correct. Three of them are the people that are closest to the activity, shall we say. Yes, you are. Okay. Yes. So what about the driver's testimony? Well, well, I think if you take a step back, the question is whether that's the sole question to consider for qualified immunity. I'm not asking, that's fine, but then do you recognize that that fact is not in dispute because we have the driver, who is the third person there. We have both the driver and the shooter saying he's inside the car. Leave aside the dragging. Well, right. I would agree with you in saying that there is not eyewitness testimony to say that he was not inside the vehicle. Well, there is eyewitness testimony that says he is. That's correct, but there's also expert testimony saying that, that the physics don't work. And you also have to, I mean. And was the, the, tell me about the expert testimony. The expert addressed not just the claim that there was, that he was being dragged, but that he was just physically in the car? Correct. The expert's asked about that separately from the dragging? Within the context of saying that if, if, if it happened the way Elliot said, then he would have been expelled from the window when the car began moving forward. Okay, but we're not going with what, we're going with what the driver said. Okay. Well, he's looking at the whole context. He's looking at what Herbert said. He's looking at what Elliot said. That's what I just asked you. If he said all that, if he takes all that, he looked at the Herbert's testimony. Herbert says he's in the car. The car's, the truck's accelerating. Did you see him being dragged? No. Well, when he kept screaming, stop, stop, stop. And I was screaming the same thing. Stop. And then after a few seconds, bop, blew me away. And he had, and that was the gun. Right. He's in the car. He's not being dragged, but he's in the car. So are you conceding that Herbert said that he was leaning in the car at the moment the officer was shot, that the officer shot the driver? Yes, Your Honor. I mean, it speaks for, yes, that is, that was, that was Mr. Herbert's testimony. Okay. Now, Officer Sellers, though, testified that Elliot was running alongside the vehicle. Correct. To what extent are you relying on that testimony? And that's a good point about what, Officer Sellers there. So the Officer Sellers is behind the incident, so he's got, he can see what's going on in front. And he says, I'm running alongside the vehicle. That's what Elliot was doing. He's running alongside. And was he asked whether his head was in the car? He wasn't specifically asked about that. But he did say he was running alongside the vehicle, you know, while this, at the key moments when these, when these cars beginning to move forward. Right. But does Officer Sellers address when the shot occurred, whether he was running alongside the vehicle? Honestly, Officer Sellers says at that moment he had turned his back. That was his testimony. That's what he said. And so he didn't see that particular moment. But, Your Honor, the question then becomes, is that definitive? I mean, does that, does that solve the issue here? For example, the District Court cited the Pittman case from the Fourth Circuit. But if you look at how Pittman has been cited going forward, there's a North Carolina District Court case, Thompson v. Farmer, 945 Federal Sub 109 from the Western District of North Carolina. Where that court denied summary judgment based on qualified immunity and said two things. One, there was a question as to whether the officer was hit by the car. But that case also said that even if he was inside the vehicle at the time that the car began moving forward, there was still a material dispute of fact that had to be resolved by a jury. That was the District Court's holding in that case, distinguishing Pittman, where another one of these dragging cases. Okay, but if you could summarize for us then. You're Mr. Callaway? Yes, ma'am. Okay. If you could summarize for us, Mr. Callaway, you've got to have more than a scintilla of evidence to resist summary judgment. Correct. Is that correct? Yes, ma'am. This is the defendant's motion. Yes. And you're saying you have Dr. Z's testimony that the defendant essentially couldn't have been leaning in unless he'd been running faster than the vehicle. Right. He could not have been in the window of the vehicle, I think is what he said, if the vehicle had been moving faster than L.A. Correct. Okay. What else do you have regarding the leaning in at the moment of the shooting? Dr. Z saying it couldn't have happened. Anybody on the scene whatsoever saying anything of a circumstantial nature? I know they didn't say anything of a direct nature to help you. Was there any circumstantial evidence of anybody at the scene that helped you? Well, you think about the circumstances of what Elliot is doing here. He is – this car is just trying to get away from him. And he has got an opportunity where he could step to the other side. And then he's – there's all these questions in Elliot's testimony as to the veracity of some of the things that he said. Now, he takes the position that he was inside the car, but is that something that we can trust based on a couple of different things, the veracity of his testimony? I mean, the way he testified – Well, it's not whether you can trust it. It's whether you have disputed it with evidence. And my concern is conceptually. Are you simply relying on the absence of evidence rather than a dispute in the evidence? I think you're saying – you know, the thing that always bothered me about this case and reading it is there's no evidence as to how fast the car was going at the moment the shot occurred. I mean, if it was going at five miles an hour, then it's kind of absurd for a police officer to be shooting somebody. Correct. If he could just walk away or get away from the vehicle. But there's an absence of evidence in so many respects, like with the speed of the vehicle. And it seems to me that maybe you're relying on the absence of evidence rather than your own evidence in dispute of the material fact. Well, we are relying in part or in significant part on the expert testimony. So that's – we're not – you're right in the sense that there is limited eyewitness testimony. I mean, you mentioned Sellers referring to him running beside the vehicle, that he was running. Elliott even at one point said he was running beside the vehicle before his estimation that he had been trapped and dragged. But there is that evidence to counter the evidence they have. But the question – but there's that question there. There's that uncertainty there. And that's what juries are designed to deal with, to resolve that. I'm sorry. Let me also address this. The question of – it seems the court – and I would like to address the idea that being trapped and dragged, that that question, which you're saying you're giving us, certainly understand that, that that's not the key question for the constitutional issue. If you look at what this court has done, they've said two things are very important for the qualified immunity question. When a car is leaving and when that's the particular weapon you're saying was being used for deadly force, we're talking the position of the officer and we're talking where the shot came from. Was it from the side or was it from the front? That's what the court looked at in Waterman. That's what the court looked at in Crane. That's what the court looked at, and even though I know it's not 1983 case, in the Lee case this summer, the court looked at that particular question. How does that help you? Well, because the shot came from the side window, which is important here because it's showing officer's position. Obviously, there's this dispute as to whether he was trapped and dragged, so the officer's position and where the shot came from. In that case, there was a dispute as to whether the officer was hit by the car and whether he was on the side or in front of the car when he fired the shot. There was evidence he was on the side. There was evidence he wasn't hit by the car. And so this court said there's got to be a jury trial on that issue, that that is not a summary judgment matter. Is your theory of liability dependent on Elliot's torso not being inside the truck? Is it accelerating? No, I don't believe that it is, because I believe the question of whether he was trapped and dragged is the important question because here's the other important question. Well, actually, the question is whether or not an objective person would believe his life was in danger. That's correct. I mean, you could have that, whether he's trapped and dragged or not. That's true, but, Your Honor, Elliot said, the reason I shot him is because I was being dragged. And the day after, when he gave his statement to the police, he said, that's why I shot him. I feared for my life. He's not shooting him because he's being dragged. It's because he believes his life is in danger. But he believed his life was in danger solely because he was being dragged. That's what he told the officers. And that's what the defendants moved on when they moved from summary judgment. They said, give us summary judgment because this guy was dragged. That's why he felt the danger for himself and himself alone. And that's why he shot the guy. So you're willing to accept the assumption for your theory of liability that he was inside that, his torso was inside that truck. Most of his torso or part of his torso when the shot was fired. I wouldn't accept that. I would say that even if the court were to find that were true, that Undisputed. I mean, we don't find well enough that something's true. Exactly. Even if the court were to find that were not disputed, then that wouldn't necessitate summary judgment under these facts. Since he was trapped and dragged and based on how Pittman has been interpreted, including that disreport case I referred you to earlier on that matter. So even though he's inside, the torso is inside the truck, and the truck is accelerating away, you think it's dependent on whether or not he's being, like your theory of liability is dependent on whether or not he's being dragged or your ability to prove he wasn't being dragged. Yes. Well, it goes to the question of whether he had a reasonable fear for his life. Now, part of it is your point. How fast is the car going? It's less than 100 feet from where it started moving. So it's at a very, we can estimate that it's not going too quickly at that time. So what's the fear that he had? Now, he said his fear was for himself and his fear was dragging. Now, this court in Waterman said, look, we will look at what you say happened as your justification for what you did. We're not going to look at other possible ones. Because Waterman said they were fearful for their own safety. We're not going to look at whether it was possible they could have shot him because it could have hurt someone else down the road. We're going to look at what you say. And that's also why we cited the Rainey case. The Rainey case from the Fourth Circuit basically said when you have to determine what actually happened, what really happened to resolve a key question of fact, then you can't give summary judgment when it's disputed in that way. And so we have to look at the justification he actually offered and judge from that perspective, from an objective person's perspective, but using the justification he had. We can't divorce the analysis from what he said happened and go to sort of hypotheticals. I want to address the other issue, but I see that my time is up. Thank you very much. Counsel, do you have a rebuttal? Yes, Your Honor. I'll be brief in my rebuttal. Again, I appreciate the opportunity to come before you this morning. I want to point out, for the record, there were some questions about the intentions and some of the fears and whether or not Officer Elliott's fear was reasonable given his relative position to the moving vehicle. In the joint appendix, if I could point the Court's attention, beginning on joint appendix page 98, and it goes through on page 99 as well, and this is a deposition of Officer Elliott, and the question was on line 22, you testified moments ago that you were in fear for your life. Is that correct answer? Yes. Okay. And you testified that it was because Melvin Lawhorn was attempting to drive away from your traffic stop with you inside of that, his vehicle. The answer, yes. Further question. And when I say his vehicle, it's not necessarily his. It was the vehicle that he was riding in as a passenger. Yes. But he was also attempting to drive away while a passenger. Yes. So there's clear evidence in the record and before the Court, in which the District Court obviously considered that they didn't even look at the dragging issue. So you're saying there's a fair inference from that evidence that he was inside the vehicle at the time he shot him? Not only that. He was afraid when he was inside the vehicle when they started to accelerate. Correct. But does that evidence show that he was inside the vehicle at the time he was being shot? Yes, Your Honor. At the time the driver was being shot? Yes, Your Honor. Why is that a necessary inference? Well, I don't necessarily even think it's a necessary inference. I think that was the finding of the District Court in that order. Well, that's my point. Based on some evidence. Correct. So where's the evidence?  That is one of the pieces, Your Honor, that testimony. Do you have anything more direct by way of evidence to show that at the time the shot was fired, the officer was leaning in the vehicle? Not that he was leaning in when it started to accelerate, but that at the time he fired the shot, he was leaning in the vehicle. Correct, Your Honor. If I could, I would like to point the Court's attention to the joint appendix on page 113. That was the deposition of Daryl Herbert, who was initially the driver of the Ford Ranger, who then at some point in time during the altercation became the passenger. Right. But I was talking about the testimony of Officer Elliott. Did Elliott say in his deposition that he was inside the car when he gave the shot? Yes, Your Honor. Okay. Where's that? Okay. I can go grab that for you, Your Honor. Fine. We'll bring that. Your Honor, while I'm looking for that, I'd also – sorry, I forgot the microphone. While I'm looking for that, Your Honor, I'd also like to point out that in the joint appendix on page 113, again, it's not Officer Elliott, but it is the driver, Mr. Herbert, who said when asked, did you see him, Officer Elliott, grabbing with his hand, holding on to Mel? The answer was, yeah, I saw his body and body, yeah, torso part, yeah, inside the windows. And this was in direct question. At the time of the shot? Your Honor, if you go and if you look at the context of what that conversation and the questioning was, it was him asking about whether he was being dragged involuntarily. The answer was, no, I didn't see him being dragged. I saw him inside the vehicle. I think your better references are 528 through 533, but that's all right. Tell us about the plaintiff, what he said, the defendant, what you're looking for here. Correct, Your Honor, and that's exactly, I think you pointed out 528. Sorry, moved away from the microphone again. 528 is Herbert. You don't want it Herbert. You want to get your man. Correct. I apologize, I'm not locating this information as quickly as I can. Do you think there's somewhere in this record? Correct. Yes, Your Honor. There is definitely information in this record. I know there's information. And testimony, obviously, and testimony from Officer Elliott saying that he was substantially inside, leaning in the window at the time that the shot was fired. And for that reason, Your Honor, we think that the district court properly conducted its analysis of whether it was reasonable for Officer Elliott to utilize deadly force at the time of the shooting. Can I have nothing further? Is there any questions? No, thank you. Thank you. Your Honor, the evidence that we're relying on to show that he was not inside the vehicle includes Seller's testimony outside to the record, page 543, where he testified that he saw Mr. or Officer Elliott running alongside the vehicle, trying to keep up with the truck, and then specifically in answer to the question at line 20, while running alongside, answer right. So running alongside was his testimony. But, of course, maybe it's not physically possible, but you can see the car ends up in a ditch. The driver tells us it's only through his great driving skills that he could get there because there's so much going on in the car and the pressing down on the accelerator and the one foot on it and another foot on it and lots going on in the car. But you can see that if you're not dragged, you would be running alongside the car, no matter how quickly, right? Well, yeah. Because five miles an hour, ten miles an hour is pretty fast to be walking. That's true. That's true. But it does support the conclusion that running alongside certainly doesn't support their conclusion. It actually supports our conclusion that he's running alongside at the key moments as opposed to being inside the vehicle at the key moments. But if it's possible, I understand your expert says it's physically not possible to have your torso or a portion of your torso in the car, and we're not talking about the dragging anymore, and to have this all happen. But just hypothesize another case where that is possible. So if your torso is inside the car, you might also be walking along. Your legs are down there, your torso is up here, you know? Correct. Yeah, that would be possible. I mean, a person as tall as I am could do that. Yes, ma'am, that's correct. How tall was the defendant? That I don't know, Your Honor. We don't know? No, but it's in the record. Okay. Yeah, it would be in the record. Your Honor, I do want to mention just briefly that this idea that the dragging has sort of been taken off the table, that we're just talking about the location at the time of the shots really does a disservice in the sense that it doesn't look at why he shot him. That has to matter. It has to matter why he said that he fired the shot. He didn't say he shot him because he was inside the vehicle. He said he shot him because he was being dragged along the roadway. That was what caused him to fear. That's the question. Did he have a reasonable fear? Well, doesn't that have to start with why did he say he had fear? What caused the problem? What led him to fire that shot? It wasn't because whether he was or was not. It wasn't because his head was inside that vehicle. It was because he said he was being dragged. And I think what we've got here is they filed their summary judgment and said, And then this report says, well, there's evidence that suggests he's not being dragged, and now we've got this issue as whether his head's inside the vehicle or not. That's not why he shot him. And that has to matter. I mean, that's what Rainey said. We've got to at least start with what the officer said caused him to do what he did. That's not to suggest that this is I'm trying to ask you to apply a subjective standard. What I'm saying is that when you're looking at an objective standard, it has to matter what the officer said motivated, or not motivated, what his conduct was, what led to his decision-making process. I'd also note, Your Honor, just sort of here at the end there, there's an inherent inequity here. There's an inherent inequity in allowing them to get the summary judgment by saying simply, they don't have the facts. All the while, they are keeping us from getting those facts. They are telling us things are false about these cameras. They're telling us that they don't have these cameras. There are no cameras that exist. And then you get to the issue of the cars. And that's why we cited spoliation in that motion. We said under Rule 34, show us the cars. We go back and forth for a couple months with e-mails, and then they say, we don't have the cars anymore. We sold one of them at an auction. Another one's gone. This court held in Silvestri that when you've got key evidence, you've got a duty to preserve it. They didn't do that with the cars. And here we've got one after the other after the other where we just can't get the evidence we need. Dash cams are the objective standard when it comes to these things. There's a dash cam video of what happened here, all these questions about where is his head, and is he being dragged off the table. We get the answer right there. But they're the only ones who have it. Kenan, did you have a question? Go ahead. I was just waiting for him. I'm sorry. No, that's okay. So if you would for us, Mr. Callaway, sum up. Let's just say that the panel would disagree with you. Just assume that the panel would disagree with you, that the material dispute about being dragged is enough to get you past the motion and get you to trial. Go over for us the evidence that supports your position that he was not leaning into the vehicle at the moment the shot was fired. I know you have Dr. Z. What else do you have? It would be Mickey Seller's testimony that he was running alongside the vehicle, which is supported by Elliott's testimony that, at least at the beginning of the transaction, he was as well running alongside the vehicle. And so we think that presents at least a question of fact. It doesn't have to be resolved. It presents a question of fact as to where he is. Now, the only testimony, and I'm not saying that it's not there, but he's saying that the only testimony that would suggest he's inside that vehicle is Elliott's testimony. He's the only one that ever even supports that. Well, Mr. Herbert, too. Well, excuse me, also Mr. Herbert in his statement. So you have those disputes. It's those two witnesses versus at least the inferences. We get all the inferences. We have to get all the inferences on that disputed question. So I think that would be sort of the sum of the evidence on that issue. And if there are no further questions from the Court, we'll rest for a moment. Thank you very much. Thank you. We will come down and greet the lawyers and then go to our last.
judges: Diana Gribbon Motz, William B. Traxler, Jr., Barbara Milano Keenan